# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| CINCINNATI INSURANCE COMPANY, ) | |
|               Plaintiff/Petitioner, ) | |
| ) | |
| vs. ) | NO. _____ |
| ) | |
| THE CASITAS AT MORNINGSTAR ) | |
| HOMEOWNERS ASSOCIATION, INC. ) | |
|               Defendant/Respondent. | |

## PETITION FOR APPOINTMENT OF UMPIRE

COMES NOW Plaintiff/Petitioner The Cincinnati Insurance Company ("Cincinnati") and for its cause of action, alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff/Petitioner, The Cincinnati Insurance Company ("Cincinnati") is an insurance carrier with its principal place of business in Fairfield, Ohio, duly registered to do business in the State of New Mexico.

2. Defendant/Respondent The Casitas at Morningstar Homeowners Association, Inc. ("Morningstar") is an incorporated New Mexico homeowners association with its principal place of business located at 3650 Morning Star Drive, Las Cruces, NM 88011.

3. This Court has jurisdiction over the subject matter of this action and the parties hereto pursuant to 28 U.S.C. § 1332(a)(1) and 9 U.S.C. § 4 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. In addition, Plaintiff/Petitioner seeks a declaratory judgment pursuant to 28 U.S.C. § 2201.

4. This judicial district is a proper venue under 28 U.S.C. § 1391 because Morningstar is located in, and is subject to service of process, in this district and a substantial

part of the events or omissions giving rise to the claims asserted in this action occurred in this district.

## FACTUAL BACKGROUND

5. Morningstar is an incorporated homeowners association that governs the condominium complex known as the Casitas at Morningstar. The condominium complex consists of 40 buildings which were constructed between 2005 and 2007.

6. Cincinnati issued a commercial property policy of insurance from Cincinnati ("Policy"). **Exhibit A**. The effective dates of coverage of the Policy are November 2, 2013 to November 2, 2016.

7. On October 22, 2015, Morningstar advised Cincinnati of potential damage to 19 of Morningstar's roofs, roof top equipment, and one carport, all of which purportedly occurred during two hail storms on October 3 and October 21, 2015.

8. The two hailstorms were designated as catastrophic events by the New Mexico Department of Insurance.

9. On October 27 through October 29, 2015, RMC Group ("RMC") inspected the roof in an effort to estimate the damages associated with the loss reported by Morningstar.

10. RMC determined that the roof had not sustained hail damage. It determined that certain observed holes in the roof membrane had other causes. Representatives of Morningstar advised RMC that Morningstar was aware of the holes in the roofing membrane, which Morningstar attributed to faulty installation and material issues. Morningstar further advised RMC that Morningstar was pursuing the installer and perhaps others in litigation because of the defects in the membrane.

11.     Cincinnati also retained Engineering Design & Testing Corp. ("EDT") on November 23, 2015 to assess and evaluate the extent of the damage reported by Morningstar. This was done in order to verify RMC's opinions.

12.     EDT conducted an inspection of the roofs on December 1 and 2, 2015 and issued its report on December 31, 2015.

13.     EDT observed some areas of damage to the membrane roof, but it concluded that the most of the observable damage was not related to the October 2015 hail storms. EDT recommended against replacing the membranes on the affected roofs, and further recommended that certain small areas of damage that showed anvil-shaped fractures that could be attributable to hail be patched in accordance with the membrane manufacturer's specifications.

14.     Based on the information contained in the RMD and EDT reports, Cincinnati issued a payment of $54,540.93 on January 4, 2016 to compensate Morningstar for the damage associated with the October 3 and October 21, 2015 hail storms.

15.     Dissatisfied with the amount paid by Cincinnati, in February of 2016, Morningstar obtained a quote from its own contractor, Champion Contractors and Services ("Champion"), for complete replacement of the roof. Champion's estimate, which totals $1,228,359.46, does not make any findings concerning the cause of any damage to the roof membranes, and further does not acknowledge Morningstar's then-pending litigation against the installers asserting the faulty installation of the roof membranes.

16.     Morningstar also contracted with Lilley Engineering, Inc. ("Lilley") to inspect the roofs at issue. On April 18, 2016, Lilley inspected the roofs and generated a report dated April 19, 2016. The report acknowledges that "it appeared that the TPO membrane was installed

directly upon plywood," but does not acknowledge the then-pending litigation against the installers for the faulty installation of the roof membranes.

17.     Lilley concluded that there was some evidence of hail damage, but acknowledged that the observed problems were relatively minor.  Notwithstanding that acknowledgement, Lilley mysteriously opined that there was "hidden damage" to the roof membranes.

18.     Given the discrepancies between the two sides' reports, Cincinnati and Morningstar agreed to retain another independent engineering company, Thorntom Tomasetti, to conduct an investigation into the damage reported by Morningstar.  Thornton Tomasetti conducted its investigation from May 24 to May 26, 2016.

19.     Thornton Tomasetti issued a report on or about July 5, 2016 concerning its investigation.  In its report, Thornton Tomasetti concluded that the damage to the 19 roofs reported by Morningstar was caused by improper installation of the composite roofing material, and not by hail damage.

20.     Thornton Tomasetti noted that the composite roofing material had been installed over construction debris (including loose nails and sharp gravel), and had been installed directly over oriented strand board, which is not proper installation pursuant to industry standards.  There were soft spots observed in the oriented strand board under the composite material, which was indicative of long term moisture damage.  Thornton Tomasetti noted that there were cuts in the membrane roof for mechanical equipment, and cuts and indentations in the membrane likely due to installers walking on the membrane.  Thornton Tomasetti concluded that the condition of the roofs was not attributable to hail damage.

21. Thornton Tomasetti determined that the carport and the roof top equipment had sustained some damage due to the catastrophic hail storms and recommended repairs for those items.

22. The Thornton Tomasetti report recommended repairs that fell within the scope of the original RMC estimate from October of 2015 and upon which the $54,540.93 settlement check was based.

23. Despite numerous efforts to attempt to resolve the dispute concerning the alleged damage associated with the October 3 and 21, 2015 hail storms, Cincinnati and Morningstar were not able to reach agreement. As a result, Cincinnati issued a letter on January 6, 2017 invoking a provision under the Policy concerning dispute resolution. See **Exhibit B**.

24. The provision of the Policy on which Cincinnati based its January 6, 2017 letter states:

> 2.  Appraisal
>
> If we and you disagree on the value of the property, the amount of Net Income and operating expense, or the amount of "loss." Either may make a written demand for an appraisal of the "loss." In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge or a court having jurisdiction. The appraisers will state separately the value of the property, the amount of Net Income and operating expense, and amount of "loss." If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
>
> a. Pay its chosen appraiser; and
>
> b. Bear the other expenses of the appraisal and umpire equally. If there is an appraisal, we still retain our right to deny the claim.

25. Cincinnati chose Mr. Peter Korondi of Worley as its appraiser, and advised Morningstar of its choice of appraiser on January 6, 2017. See, **Exhibit B**.

26. Morningstar designated Bernie Wilson of Champion as its appraiser.

27. Mr. Korondi, on behalf of Cincinnati, suggested the Honorable Alan Torgerson (ret.) or the Honorable Wendy York (ret.) as potential umpire candidates. Mr. Wilson, on behalf of Morningstar, rejected Cincinnati's suggestions.

28. Mr. Wilson suggested Mr. George Rawson of Las Cruces as a potential umpire. After some investigation, Mr. Korondi rejected Mr. Rawson as an umpire.

29. Mr. Korondi and Mr. Wilson have been unable to reach a mutual agreement concerning the identity of the umpire.

## COUNT I
## DECLARATORY JUDGMENT

30. In accordance with the terms of the Policy, Cincinnati seeks a determination by the Court concerning the selection of an umpire for this matter.

31. The declaration that Cincinnati seeks properly constitutes a declaration of the rights of the parties pursuant to 28 U.S.C. § 2201.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff/Petitioner Cincinnati Insurance Company is entitled to, and respectfully requests an order:

A. Compelling the parties to select an umpire, or in the alternative, naming an umpire, pursuant to the terms of the Policy; and

B. Ordering such other relief as the Court may deem just and proper.

Respectfully Submitted,

MODRALL, SPERLING, ROEHL, HARRIS
   & SISK, P.A.


By: /s/ *Jennifer G. Anderson*
   Jennifer G. Anderson
   Post Office Box 2168
   500 Fourth Street NW, Suite 1000
   Albuquerque, New Mexico  87103-2168
   Telephone: 505.848.1800
   *Attorneys for Cincinnati Insurance Co.*